UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MARISSA S. ANDREWS, )<br>)<br>    Plaintiff )<br>)<br>v. )<br>)<br>SOCIAL SECURITY ADMINISTRATION )<br>COMMISSIONER, )<br>)<br>    Defendant ) | 1:10-cv-00293-DBH |

**REPORT AND RECOMMENDED DECISION**

The Social Security Administration found that Marissa Sue Andrews has severe impairments consisting of degenerative disk disease and scoliosis, but retains the functional capacity to perform substantial gainful activity in occupations existing in significant numbers in the national economy, resulting in a denial of Andrews's application for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act. Andrews commenced this civil action to obtain judicial review of the final administrative decision. I recommend that the Court vacate the administrative decision and remand for further proceedings.

**The Administrative Findings**

The Commissioner's final decision is the February 18, 2010, decision of Administrative Law Judge Guy E. Fletcher because the Decision Review Board did not complete its review during the time allowed. Judge Fletcher's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims. (Docs. Related to Admin.

Process, Doc. No. 8-2, R. 1, 7.[1])

At step 1 of the sequential evaluation process, the Judge found that Andrews meets the insured status requirements of Title II through June 30, 2012, and has not engaged in substantial gainful activity since January 31, 2007, the date of alleged onset of disability. (Findings 1 & 2, R. 9.)

At step 2, the Judge found that Andrews suffers from two severe impairments: degenerative disk disease and scoliosis. He further found that the record does not depict a severe mental disorder and that a right-sided lumbar disk herniation does not cause more than a slight limitation. (Finding 3, R. 10.)

At step 3, the Judge found that this combination of impairments and the related symptoms would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P. (Finding 4, R. 10.) The Judge indicated that he specifically considered listing 1.04 (disorders of the spine), but his commentary inexplicably alludes to a need to show "a central nervous system vascular accident causing sensory or motor aphasia," which language appears to be drawn from listing 11.04 (central nervous system vascular accident). Despite this clearly erroneous reference to the wrong listing, Andrews does not contend that her medical records are sufficient to establish a listing-level impairment under the standards set forth in listing 1.04.

Preliminary to further evaluation at step 4 or step 5, the Judge assessed Andrews's residual functional capacity (RFC). The Judge found that Andrews's combined impairments result in a restriction to light work that would permit her to change position every 30 minutes, at a minimum, but excluding work requiring negotiation of various obstacles and postures more

---

[1] The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 8.

than occasionally (ladders, ropes, scaffolds, stairs, ramps and balance, stoop, kneel, crouch, crawl). (Finding 5, R. 10.) The Judge rejected the contrary opinion provided by the primary care provider, describing it as "far out of line with what would be expected" from the objective evidence. (R. 15.)

At step 4, the Judge found that this degree of limitation left Andrews capable of performing past relevant work as a medical assistant and he relied on vocational expert testimony to that effect. (Finding 6, R. 16.) As an alternative finding, the Judge determined that, even if Andrews were restricted to sedentary work, the remaining limitations associated with sitting and standing, obstacles, and postures would permit a finding of "not disabled" by application of the framework of the Guidelines, because such limitations would not significantly erode the sedentary work base according to Social Security Ruling 96-9p. (Id.)

**Discussion of Plaintiff's Statement of Errors**

Andrews argues that the Judge erred in regard to the residual functional capacity finding because he failed to give substantial weight to the treating source statement of Robert Abrams, MD (supervising NP Diana Van Dermast); failed to properly apply Ruling 82-59p with regard to Andrews's discontinuance of physical therapy in 2008; and erroneously concluded that she could return to past work as a medical assistant. (Statement of Errors at 6, Doc. No. 12.) Andrews does not contest the Judge's determination that there is no severe mental impairment. Nor does Andrews emphasize her limited scoliosis. The contest concerns the limiting effects of the degenerative disk disease impairment. Oral argument focused on the decision to withhold controlling weight for the treatment provider's opinion of functioning, the significance of not attending physical therapy due to transportation issues, and what inferences could be drawn from scattered record references.

3

The standard of review is whether substantial evidence supports the Commissioner's findings.  42 U.S.C. §§ 405(g), 1383(c)(3); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

## A.  The Evidence

Andrews is a young woman, approximately age 29, who lives with her parents in Pembroke, Maine.  At age 19, Andrews underwent a microdiskectomy at Boston's Shriner's Hospital due to a right-sided disk issue that caused severe pain.  Andrews would later undergo a repeat surgery for this right-sided condition in 2008.  In between those years Andrews had one child, pursued some post-secondary education, and obtained work as a medical assistant that ended in late 2006 or January of 2007.  Following a "pop" in her back in 2006, and the commencement of severe left-sided back pain and radiculopathy, Andrews's PCP referred her for evaluation by Dr. Victor Ho, M.D., of New England Neurosurgery (1F, 12F) and for pain management by Dr. Rita Ten, M.D. of the Downeast Pain Clinic (Ex. 2F).  Dr. Ten indicated that a December 2006 MRI without contrast demonstrated:

> narrowing of the vertebral disk spaces at the L4-L5 and L5-S1 levels with evidence of narrowing of the vertebral disk spaces at the L4-L5 and L5-S1 levels with evidence of a small disk protrusion posterolaterally to the right at the L4-5 causing some distortion of the thecal sac and compression on the right L5 nerve root in the lateral recess.  There is also possible compression on the left L5 nerve root between the disk margin and the facet joint at the L4-L5 level.

(Ex. 2F, R. 221.) Physical therapy was placed on hold at this time due to unrelenting leg pain. (Ex. 4F.) Oxycodone was provided for pain management and provides some relief. (Ex. 12F, R. 288.) Epidural injections did not provide relief. (Ex. 12F, R. 287.) A November 2007 MRI report from St. Joseph's Hospital indicates:

> At L4-5, there is a broadbased disc bulge eccentric to the left causing mild spinal stenosis and moderately severe right lateral recess narrowing. There is no significant neural foraminal narrowing.
>
> At L5-Sl, there is broadbased disc bulge slightly eccentric to the left causing minimal spinal stenosis and minimal left lateral recess narrowing. There is probable moderately severe left neural foraminal narrowing. It is not well visualized on the sagittal images.

As compared with a 1998 image, it was reported that "the disc protrusion at the L4-5 level is less prominent on the current study. At the L5-S1 level, the disc bulging posterolaterally to the left with possible minor displacement of the left S1 nerve root in lateral recess is new." (Ex. 11F, 279, 281.) The new MRI raised both right-side and left-side concerns:

> The MRI . . . demonstrates evidence of narrowing of the vertebral disk spaces at the L4-5 and L5-S1 levels with evidence of a small disk protrusion posterolaterally to the right at the L4-5 level causing some distortion of the thecal sac and compression on the right L5 nerve root in the lateral recess. There is also possible compression on the left L5 nerve root between the disk margin and the facet joint at the L4-5 level.

(R. 282.) Dr. Ho evaluated both of the MRIs and counseled Andrews concerning the same. He reported that the MRIs did not reveal a "significant compressive pathology," and he assessed "spondylitic change and disc degeneration at L4-5 and L5-S1." (Ex. 12F, R. 287.) He did not diagnose a need for surgical intervention and assessed that the imaging showed "barely any postoperative changes related to her prior [1999] surgery." (R. 289.) According to Dr. Ho, the later MRI study "essentially shows the same changes at L4-5 and at L5-S1 with bulging discs that are not compressing the exiting nerve roots of this level." (R. 283.) Dr. Ho referred

Andrews for pain management.

Dr. John Herland, M.D., of St. Joseph's Hospital conducted a physical examination of Andrews for pain management in January of 2008 and also reviewed the MRIs. Dr. Herland thought the MRIs were potentially more significant. "At L5-S1, there is a left posterolateral to far lateral disk herniation, also subligamentous, which appears to approach and possibly impinge upon the exiting left L5 nerve or traversing left Sl nerve." (Ex. 13F, R. 290.) He observed diminished sensation to left lower extremity touch throughout the L5 distribution, antalgic gait, and positive signs in left-sided range of motion and leg raise tests. (R. 291.) Dr. Herland's impression was that more could be learned from a new effort to place an epidural injection in the L5-S1 joint rather than the L4-L5 joint and, possibly, perform a provocative diskogram. (Id.)

In May of 2008, Andrews returned to Dr. Herland with reports of severe right-sided pain, confirmed upon examination, which placed the symptoms in the L5 distribution. (Ex. 21F, R. 360.) He indicated right-sided pain significantly greater than the left-sided symptoms. (Id.) A new MRI demonstrated progression of the L5 protrusion, resulting in "severe stenosis of the spinal canal as well as mass effect on originating L-5 nerve root, right greater than left." Also noted, but of lesser significance, was "moderately severe spinal canal stenosis and mass effect on originating left S-l nerve root." (R. 358.) Dr. Herland recommended surgical intervention. (R. 356.) Andrews chose to consult further with Dr. Ho and agreed to let him perform a hemilaminotomy and microdiskectomy at the L4-L5 level, completed August 21, 2008. (Ex. 21F, R. 363, 368; Ex. 23F, R. 379.) An August 21, 2008, postoperative letter from Dr. Ho. stated that "leg pain has improved immediately." (R. 377.) A September 4, 2008, postoperative note from Dr. Ho's physician assistant states that Andrews was doing "remarkably well" with preoperative right-sided pain completely resolving and with Andrews doing "plenty of walking."

There was an indication that Andrews continued to rely on three to four Percocets per day and a recommendation that she gradually wean herself from the same. (R. 376.)

Andrews commenced a new course of physical therapy in September 2008, but was discharged by November 2008 due to failure to attend. The physical therapist who authored the discharge summary indicated that Andrews had experience "some relief of pain" from therapy. (Ex. 23F, R. 382.) Other PT notes indicate that Andrews reported continued chronic pain on the left side with 4 in 10 or 5 in 10 intensity, post-operatively. (R. 384.) A December 2008 progress note from Andrews's PCP in Lubec reports "back pain stable on medication." (Ex. 24F, R. 414.) An August 2009 note similarly reports: "Stable. Doing fine." (R. 404.) Multiple progress notes indicate that Andrews was consistently prescribed Oxycodone for pain.

On April 18, 2008, well before Dr. Ho's August hemilaminotomy and microdiskectomy procedure, Kirby Von Kessler, M.D., performed a case analysis on behalf of Maine Disability Determination Services. (Ex. 16F.) He assessed a light work capacity, a maximum sitting interval of three-hours and walking or standing interval of only 30-minutes, with a total of six hours sitting daily and two hours standing or walking. (Ex. 17F.) Subsequent to this assessment, Andrews experienced the worsening disc protrusion and underwent the August 2008 procedure. The other DDS expert review of record is that of Richard T. Chamberlin, M.D., but it is dated November 1, 2007, and does not include consideration of the November 2007 MRI study. (Ex. 10F.) Dr. Chamberlin's assessment was similar to Dr. Von Kessler's, though he opined that Andrews could be upright standing or walking for a total of six hours in a workday. (R. 272.) Both Dr. Chamberlin and Dr. Von Kessler relied to a significant degree on the physical evaluation of August 7, 2007, by David Rioux, M.D., also on behalf of Maine Disability Determination Services, whose findings do not conflict with either of the other DDS consultants.

7

(Ex. 8F.) The record reflects that no further review of the file was performed by a DDS medical examiner subsequent to the progressive disc protrusion at L4-L5 that called for Dr. Ho's surgical intervention. The only post-operative expert opinions as to work-related functioning are those of Andrews's PCP, Diane Vandermast, FNP, countersigned by the supervising physician.

NP Vandermast submitted a residual functional capacity questionnaire in November 2008 (Ex. 18F) and again in October 2009 (Ex. 25F). She assessed that Andrews could not handle any stressful work, which would cause tension and increased pain, could only sit for 30 minutes at a time, and could only stand for 10 minutes at a time. In all, NP Vandermast opined that Andrews could sit, stand and walk for a total of less than two hours over the course of an eight-hour workday. NP Vandermast specified additional limitations associated with hazards and postures. Her opinion is countersigned by Dr. Robert Abrams, M.D. (Exs. 18F, 25F.)

B. Discussion

Preliminary to further evaluation of the claimant's alleged disability at steps 4 and 5, the Commissioner must assess the claimant's residual functional capacity (RFC). RFC amounts to "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The measure of a claimant's RFC is a function of "all of [the] medically determinable impairments of which [the Commissioner is] aware," including those found not sufficiently severe for purposes of steps 2 and 3. Id. §§ 404.1545(a)(2), 416.945(a)(2). In general, the claimant is responsible for providing the medical evidence needed to make the RFC finding, though the Commissioner has an obligation to facilitate the development of the record, such as by arranging for consultative examinations, as needed, and referring the medical records for expert review and assessment. Id. §§ 404.1545(a)(3), 416.945(a)(3).

The Judge's residual functional capacity finding is based on the existence of a severe case

of degenerative disk disease at L4-L5 that has required surgical intervention subsequent to the last assessment by DDS-consulting physicians. But for the surgery of 2008, certainly a significant medical development, I would likely recommend that the Court affirm the administrative decision based on the consultative experts' opinions as to functioning and the Judge's general utilization of the materials of record. However, there was no consultative review of the record post-operatively and the Judge neglected to call a medical expert to address the new medical evidence at the administrative hearing. The Commissioner contends that this approach is acceptable and should not require remand where the treatment provider's opinion as to functioning is authored by a nurse practitioner and merely countersigned by a physician, absent evidence that the physician ever examined the claimant. I do not find this line of argument productive in this case. In my view, the significant development of the medical record subsequent to all DDS assessments of record called for renewed evaluation. The progressive disc protrusion was a significant event in Andrews's treatment history and the fact that surgery alleviated extraordinary discomfort does not reasonably establish that the preoperative opinion evidence adequately describes the post-operative condition. Although the Judge's assessment of the post-operative record may be accurate, in the absence of an expert opinion sharing this view, the Judge's lay assessment of the new evidence is not substantial evidence of a greater than sedentary work capacity, which is necessary to support the Judge's step 4 finding.[2] The Judge's findings are not conclusive in this situation because he has independently assessed matters entrusted to the experts. <u>Nguyen</u>, 172 F.3d at 35.

---

[2] The Commissioner did not attempt to explain why a theoretical restriction to sedentary work involving a need to change position in 30-minute increments and including various obstacle- and posture-related restrictions would call for a finding of not disabled under the framework of the Medical-Vocational Guidelines. As the Commissioner bears the burden at step 5, affirming such a finding in the absence of explanation is not appropriate.

**Conclusion**

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court vacate the Commissioner's final decision and remand for further proceedings consistent with the foregoing discussion.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 8, 2011